**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TEEVEE TOONS, INC. (d/b/a TVT RECORDS) & STEVE GOTTLIEB, INC. (d/b/a BIOBOX), | ) ) ) |
| Plaintiffs, | ) ) |
| - against - | ) ) |
| GERHARD SCHUBERT GMBH, | ) ) |
| Defendant. | ) ) |

00 Civ. 5189 (RCC)

MEMORANDUM & ORDER

**RICHARD CONWAY CASEY, United States District Judge:**

TeeVee Toons, Inc. and its affiliate Steve Gottlieb, Inc. ("Plaintiffs") brought this action against Gerhard Schubert GmbH ("Schubert"), claiming that Schubert improperly manufactured a packaging system commissioned by TeeVee Toons, Inc. ("TVT") and alleging breach of contract, fraud, and negligence. Schubert moves for an order granting summary judgment in Schubert's favor on Plaintiffs' claims. For the following reasons, Schubert's motion is **GRANTED** in part and **DENIED** in part.

## I. BACKGROUND

In the early part of the 1990s, TVT record-company president and founder Steve Gottlieb ("Gottlieb") invented and patented a biodegradable-cardboard "flip-top" packaging called the "Biobox," which was designed to provide a secure, environmentally friendly way to package audio and video cassettes. (See United States Patent 5,361,898.) In 1994, Gottlieb began searching for a company that could develop a system capable of mass-producing the Biobox, and he settled on the German firm Schubert. At the time, Schubert marketed its products in the United States through an exclusive agency agreement with Rodico, Inc. ("Rodico"), a New Jersey–based company.

After protracted negotiations, TVT and Schubert entered into a written contract in February 1995 for Schubert to build a Biobox-production system ("February 1995 Quotation Contract"). Shortly thereafter, problems started accumulating. First, Schubert experienced delays that set the project back nearly two years. In 1997, when the Biobox-production system ("Schubert System") was finally finished and delivered to Cinram, Inc. ("Cinram")—the production facility in Richmond, Indiana that TVT had contracted with—the system malfunctioned frequently and severely.

Eventually, upset with the lack of progress made in curing the Schubert System's defects, TVT and its affiliate Steve Gottlieb, Inc. ("SGI") commenced this action in July 2000, asserting various contract and tort claims and claiming that they suffered millions of dollars in damages, including money paid to Schubert for the system and repairs, money spent on other technicians and equipment to try to fix or replace components, money spent to set up its production facility, money that will have to be spent to replace the facility, money spent on administration of the Biobox project, and lost profits. On March 28, 2002, the Court denied Schubert's motion to dismiss Plaintiffs' Complaint. *TeeVee Toons, Inc. v. Gerhard Schubert GmbH*, No. 00 Civ. 5189 (RCC), 2002 WL 498627, at *9 (S.D.N.Y. Mar. 29, 2002). Schubert now moves for an order granting summary judgment in Schubert's favor on Plaintiffs' contract and tort claims.

## II.    DISCUSSION

### A.    Summary Judgment Standard of Review

Summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Issues of fact are "genuine" when "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party," and such contested facts are "material" to the outcome of the particular litigation if the substantive law at issue so renders them. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A court will grant summary judgment only when the nonmovant "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When viewing the evidence, a court must assess the record in the light most favorable to the nonmovant, resolving all ambiguities and drawing all reasonable inferences in that party's favor. Delaware & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990). In particular, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). Only when it is apparent that "no rational [trier of fact] could find in favor of the nonmoving party because the evidence to support its case is so slight" may a court grant summary judgment. Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223-24 (2d Cir. 1994); see also Anderson, 477 U.S. at 242-43 (noting that the role of the district court at the summary judgment stage is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial").

**B.      Lack of Standing by Plaintiff Steve Gottlieb, Inc.**

Although Schubert does not dispute that TVT has standing for the claims asserted in Plaintiffs' Complaint, Schubert contends that SGI lacks standing for each of the claims. A plaintiff without standing cannot maintain an action. See Warth v. Seldin, 422 U.S. 490, 498 (1975) (noting that the doctrine of standing addresses the question of "whether the [plaintiff] is entitled to have the

3

court decide the merits of the dispute or of particular issues"). The doctrine of standing involves both constitutional and prudential considerations. For the following reasons, the Court agrees with Schubert that SGI lacks standing to maintain any of the claims in the Complaint, and grants Schubert's motion for summary judgment as against SGI.

The constitutional basis for the standing requirement derives from Article III of the United States Constitution, which instructs that the judicial power extends only to cases or controversies, U.S. Const. art. III, § 2, and requires (1) that a plaintiff have suffered an "injury in fact" (an actual or imminent invasion of a concrete and particularized "legally protected interest") (2) that is fairly traceable to the challenged action of the defendant and (3) will likely be redressed by the requested relief, Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

Even if a plaintiff satisfies the constitutional requirements of standing, "a court may nevertheless deny standing for prudential reasons." Lamont v. Woods, 948 F.2d 825, 829 (2d Cir. 1991). Prudential considerations, which are not mandated by Article III but nevertheless act as "rules of judicial 'self-restraint,' . . . suggest that a plaintiff generally may not rest his claim on the legal rights of a third-party." Sullivan v. Syracuse Hous. Auth., 962 F.2d 1101, 1106 (2d Cir. 1992) (citations omitted); see also Wight v. Bankamerica Corp., 219 F.3d 79, 86 (2d Cir. 2000) ("Foremost among the prudential requirements is the rule that a party must 'assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" (quoting Warth, 422 U.S. at 499)).

In determining SGI's standing to assert the claims presented in the Complaint, the Court recognizes that it must "accept as true all material allegations of the complaint, and construe the complaint in favor of the complaining party," Warth, 422 U.S. at 501, but also that it may consider

4

such other facts and circumstances as may be evident from the record, <u>Gladstone Realtors v.</u> <u>Bellwood</u>, 441 U.S. 91, 110 n.22 (1979).

### 1. Lack of Standing by Steve Gottlieb, Inc. on the Breach-of-Contract Claims

SGI lacks standing to assert the breach-of-contract claims in the Complaint—which all center on the written February 1995 Quotation Contract entered into between TVT and Schubert for the Schubert System—because SGI lacks a "legally protected interest" in the February 1995 Quotation Contract such that the injury-in-fact requirement of Article III standing is not met. (See, e.g., Compl. ¶ 24 (asserting that the February 1995 Quotation Contract was "between TVT and Schubert"); id. ¶¶ 64, 68 (alleging that "TVT and Schubert entered into a valid contract for the design, construction and delivery of a Biobox production system" but that "[t]he Biobox production system that Schubert delivered to the plaintiffs did not conform with the parties' contract").)

As a general rule, absent status as an intended third-party beneficiary, one may sue on a contract only if one is a party to that contract. 3 Farnsworth, <u>Farnsworth on Contracts</u> § 10.1 (2d ed. 2001); <u>Cauff, Lippman & Co. v. Apogee Fin. Group, Inc.</u>, 807 F. Supp. 1007, 1020 (S.D.N.Y. 1992) ("A person who is not a party to the contract may bring an action for breach of contract if she or he is an intended beneficiary, and not merely an incidental beneficiary of the contract."); <u>see also</u> <u>Bochese v. Town of Ponce Inlet</u>, 405 F.3d 964, 981 (11th Cir. 2005) (holding that a plaintiff, a non-party to the contract at issue, failed to establish Article III standing to sue to enforce the contract because he was not "an intended third-party beneficiary of the rescinded agreement").

Plaintiffs do not directly allege in their Complaint, and the record does not suggest, that SGI was a party to the February 1995 Quotation Contract. The indisputable evidence demonstrates that SGI did not exist as a corporation until 1997, well after the formation of the February 1995

Quotation Contract. Secretary of State records indicate that SGI was incorporated in Delaware in September 1997 and authorized to do business in New York and Indiana in October 1997. (See Bennett Decl. Supp. Ex. A (Delaware Certificate of Incorporation for SGI filed Sept. 29, 1997; New York State Dep't Record certifying that SGI filed an application for authority to do business in New York on Oct. 15, 1997; Indiana Sec'y State Record certifying that SGI filed for certificate of authority there on Oct. 17, 1997).) And SGI only "filed income tax returns starting with tax year 1997." (Bennett Decl. Supp. ¶ 11 (citing "documents produced by Plaintiffs").) Thus, SGI cannot be said to be a party to the February 1995 Quotation Contract because that document preexisted SGI.

Further, SGI is not an intended third-party beneficiary to the February 1995 Quotation Contract. Because SGI did not exist at the time of contract formation, and because Schubert had no reason to anticipate SGI's creation, SGI cannot be such a beneficiary. See Mortise v. United States, 102 F.3d 693, 697 (2d Cir. 1996) (holding that a third party cannot be intended beneficiary if one of the contracting parties does not know of the third party's existence). And SGI cannot rest its contract claims on the legal rights and interests of TVT. See Warth, 422 U.S. at 499; Sullivan, 962 F.2d at 1106; Wight, 219 F.3d at 86. Because SGI is neither a party to the February 1995 Quotation Contract nor an intended third-party beneficiary to the Contract, SGI lacks a legally enforceable right in the contract at issue and therefore lacks Article III standing to assert the contract claims asserted in Plaintiffs' Complaint.

### 2. Lack of Standing by Steve Gottlieb, Inc. on the Negligence Claim

Because Plaintiffs' negligence claim is based on the February 1995 Quotation Contract between TVT and Schubert, SGI lacks standing to assert the negligence claim for the same reasons that SGI lacks standing to assert the breach-of-contract claims. Plaintiffs allege that Schubert failed

to live up to the "duty to exercise the reasonable care and prudence that is customary in the high-speed packaging industry . . . [w]ith respect to the design, development, and manufacture of the Biobox system." (Compl. ¶¶ 108-109.) Plaintiffs' negligent-provision-of-contractual-services theory is, by its very terms, however, contractual in nature. Plaintiffs claim that "SGI is indisputably a proper plaintiff for the negligence action because some of the service and installation contracts created in 1997 and afterward were between [SGI] and Schubert," such that SGI has standing to assert negligence as related to those contracts. (See Pls.' Mem. Opp'n at 24.) But neither the Complaint nor the record make any mention of such "service and installation contracts," and for the aforementioned reasons, SGI lacks a legally protected interest in the February 1995 Quotation Contract and cannot rest its negligence claim on the legal rights or interests of TVT.

### 3. Lack of Standing by Steve Gottlieb, Inc. on the Fraud Claim

SGI lacks standing to assert the fraud claim (fraudulent inducement) at issue because the constitutional requirements of Article III standing are not met. Plaintiffs allege that Schubert fraudulently induced "TVT to rely on [Schubert's] representations, to enter into a contract with Schubert for the Biobox production system." (Compl. ¶ 103.) Plaintiffs' fraud claim requires, inter alia, that each plaintiff justifiably relied on the misrepresentations at issue. See Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 239 (2d Cir. 1999). There is no allegation in the Complaint that SGI directly relied on any misrepresentations by Schubert, all of which allegedly occurred before the August 1997 delivery of the Schubert System and before SGI came into existence. And because SGI did not exist at the time of the alleged misrepresentations, it cannot be said to have relied on them (justifiably or not), and thus it cannot be shown that SGI has suffered a concrete and particularized injury in fact. And, again, SGI cannot rest its fraudulent inducement

7

claim on the legal rights or interests of TVT. See Warth, 422 U.S. at 499; Sullivan, 962 F.2d at 1106; Wight, 219 F.3d at 86.

Schubert's motion for summary judgment is therefore **GRANTED** to Schubert as against SGI on the ground that SGI lacks standing to assert the contract and tort claims asserted in Plaintiffs' Complaint. Plaintiffs request, in a footnote, that "in the event the Court dismisses SGI" as a plaintiff, as it now has, "that the Complaint be amended nunc pro tunc, pursuant to Fed. R. Civ. P. 21, to substitute Mr. Gottlieb, in his individual capacity, as party plaintiff to allow recovery for, inter alia, the decreased value of the Biobox patent." (Pls.'s Mem. Opp'n at 24 n.19.) Rule 21 of the Federal Rules of Civil Procedure provides that "[p]arties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just." Fed. R. Civ. Pro. 21. The Court declines. For one, Plaintiffs' suggestion that Gottlieb be substituted for SGI hardly cures the problem, as the February 1995 Quotation Contract was not with Gottlieb individually any more than it was with SGI. In addition, it would hardly be just to add Gottlieb as an individual plaintiff at this late date, well after the end of discovery, to require reopening discovery to permit inquiry, for example, into Gottlieb's personal involvement. Further, to require the additional time and resources would be, by Plaintiffs' own admission, unnecessary, as TVT, which remains a plaintiff in this action, is wholly owned by Gottlieb himself. (See Pls.' Mem. Opp'n at 24 (arguing that SGI "like TVT is 100% owned by Mr. Gottlieb himself").)

## C. TVT's Contract Claims

### 1. Choice of Law

TVT's contract claims are governed by the United Nations Convention on Contracts for the International Sale of Goods, Apr. 11, 1980, S. Treaty Doc. No. 98-9 (1983), 1489 U.N.T.S. 3, 19 I.L.M. 668 (1980) ("CISG" or "Convention"), which "applies to contracts of sale of goods between parties whose places of business are in different States . . . when the States are Contracting States." CISG art. 1(1)(a), 19 I.L.M. at 672. TVT's place of business is in the United States (in New York) and Schubert's place of business is in Germany (in Crailsheim). Both the United States and Germany are contracting states. See United Nations Comm'n on Int'l Trade Law (UNCITRAL), Status: 1980 United Nations Convention on Contracts for the International Sale of Goods (2005), at http://www.uncitral.org/uncitral/en/uncitral_texts/sale_goods/1980CISG_status.html (last visited Aug. 16, 2006) (listing the parties to the CISG, including the United States and Germany); see also St. Paul Guardian Ins. Co. v. Neuromed Med. Sys. & Support, GmbH, No. 00 Civ. 9344 (SHS), 2002 WL 465312, at *3 (S.D.N.Y. Mar. 26, 2002) (noting that "both the U.S. and Germany are Contracting States" to the CSIG and that "Germany has been a Contracting State since 1991").

Further, none of the exceptions to CISG applicability is present. Article 2 of the CISG provides that the "Convention does not apply to sales: (a) of goods bought for personal, family or household use . . . ; (b) by auction; (c) on execution or otherwise by authority of law; (d) of stocks, shares, investment securities, negotiable instruments or money; (e) of ships, vessels, hovercraft or aircraft; [or] (f) of electricity." CISG art. 2, 19 I.L.M. at 672. None of the enumerated exceptions of Article 2 exists here. Article 3 provides that the "Convention does not apply in contracts in which the preponderant part of the obligations of the party who furnishes the goods consists in the supply

of labour or services," CISG art. 3(2), 19 I.L.M. at 672, but "the preponderant part of the obligations" here pertains to the manufactured Schubert System, not labor or other services. Article 5's prohibition against CISG application to actions sounding in personal injury likewise does not block CISG application in this matter. See CISG art. 5, 19 I.L.M. at 673 ("This Convention does not apply to the liability of the seller for death or personal injury caused by the goods to any person."). Article 6 provides that "[t]he parties may exclude the application of this Convention or, subject to article 12, derogate from or vary the effect of any of its provisions," CISG art. 6, 19 I.L.M. at 673, but neither party chose, by express provision in the contract at issue, to opt out of the application of the CISG. See also Delchi Carrier SpA v. Rotorex Corp., 71 F.3d 1024, 1028 n.1 (2d Cir. 1995) (holding that when an "agreement is silent as to choice of law, the Convention applies if both parties are located in signatory nations" unless the parties have "by contract choose[n] to be bound by a source of law other than the CISG, such as the Uniform Commercial Code" (citing CISG, arts. 1, 6); St. Paul Guardian Ins. Co., 2002 WL 465312, at *3 (holding that the CISG governed the transaction in that case "because (1) both the U.S. and Germany are Contracting States to that Convention, and (2) neither party chose, by express provision in the contract, to opt out of the application of the CISG").

TVT asserts its contract claims under Articles 35 and 36 of the CISG. (See Compl. ¶¶ 60-76 (first claim for relief for failure to conform with respect to fitness for ordinary or particular purpose under Article 35(2)(a)-(b) of the CISG); id. ¶¶ 77-88 (second claim for relief for failure to conform with respect to model or sample under Article 35(2)(c) of the CISG); id. ¶¶ 89-99 (third claim for relief for breach of guarantee under Article 36(2) of the CISG).)

2. **Failure to Conform Under the United Nations Convention on Contracts for the International Sale of Goods Under Article 35**

Article 35 provides in pertinent part, that a "seller must deliver goods which are of the quantity, quality and description required by the contract and which are contained or packaged in the manner required by the contract." CISG art. 35(1), 19 I.L.M. at 679. Goods do not conform with the contract, except where the parties have agreed otherwise, unless they:

> (a) are fit for the purposes for which goods of the same description would ordinarily be used;
> (b) are fit for any particular purpose expressly or impliedly made known to the seller at the time of the conclusion of the contract, except where the circumstances show that the buyer did not rely, or that it was unreasonable for him to rely, on the seller's skill and judgment; [and]
> (c) possess the qualities of goods which the seller has held out to the buyer as a sample or model . . . .

CISG art. 35(2)(a)-(c), 19 I.L.M. at 679.

a. **Fitness for Ordinary or Particular Purpose Under Article 35(2)(a)-(b)**

1. **Fitness for Ordinary or Particular Purpose: Breach**

TVT alleges that the Schubert System "was not fit for the ordinary purpose of an automatic erecting, loading, and closing system for a flip-top cassette carton, and it was not fit for the particular purpose for which it was ordered and purchased, namely, the rapid and reliable production of Biobox packaging cartons" in violation of Article 35(2)(a)-(b). (Compl. ¶ 68.)

There is no genuine issue of material fact with respect to the Schubert System's failure to produce Bioboxes at the proper rate and of the proper quality. (See, e.g., Gottlieb Decl. Opp'n Ex. T (three-page list of Biobox "line problems" encountered by Cinram maintenance staff dated Dec. 6, 1997); id. Ex. V (memorandum from Cinram to Gottlieb dated July 16, 1999 regarding "Biobox Machine Problems"); id. Ex. W (letter from Gottlieb to Rodico dated Oct. 29, 1997 outlining speed

and quality problems and noting that Cinram was "extremely concerned given the performance of the machine"); id. Ex. X (letter from Gottlieb to Rodico dated Nov. 13, 1997 indicating Gottlieb's concerns "that Schubert understand how far the machine is away from being operational per the original specifications" with respect to speed and quality); id. Ex. Y (letter from Gottlieb to Schubert dated Nov. 24, 1997 reporting "that the Biobox project has come to a screeching halt" because of the speed and quality problems with the Schubert System); id. Ex. Z (memorandum from Rodico to TVT dated Dec. 18, 1997 discussing problems with the Schubert System); id. Ex. BB (inter-Schubert facsimile dated July 26, 1999 summarizing problems with the Schubert System).) And the record makes clear that TVT notified Schubert of this nonconformity as early as October 1997. (See Gottlieb Decl. Opp'n Ex. W (letter from Gottlieb to Schubert agent Neuber at Rodico dated Oct. 29, 1997 outlining speed and quality problems.) In the Court's view, the time interval from the Schubert System's "late August 1997" delivery (Compl. ¶ 40) to the October 1997 notification was "reasonable" as required by CISG Article 39(1).[1]

Schubert argues, however, that provisions in the "Terms and Conditions" attached to the February 1995 Quotation Contract effectively disclaim all or part of the relevant Article 35 warranty. (Def.'s Mem. Supp. at 17-18, 21; see also Gottlieb Decl. Opp'n Ex. E (February 1995 Quotation Contract) at 32 ("Please refer to the attached Terms and Conditions.").) TVT counters that "there was an express oral understanding reached between TVT and Schubert's agent that the onerous

---

[1] Although courts in other countries have, in some cases, held periods as short as 22 days between delivery and notification to be unreasonable, see John O. Honnold, Uniform Law for International Sales under the 1980 United Nations Convention 279-80 (3d ed. 1999) (collecting cases), none of those shorter time periods pertained to means of manufacture like that involved with the Schubert System, and, regardless, those foreign decisions do not bind this Court. See also Delchi Carrier, 71 F.3d at 1028 (citing the second edition of Uniform Law for International Sales with approval for "addressing principles for interpretation of CISG").

boilerplate language [of the Terms and Conditions] would not apply to [the Biobox] project." (Pls.'
Mem. Opp'n at 12.) There exists an issue of fact as to whether the attached "Terms and Conditions"
are excluded from February 1995 Quotation Contract.

Unlike American contract law, the CISG contains no statute of frauds. See, e.g., Atla-
Medine v. Crompton Corp., No. 00 Civ. 5901(HB), 2001 WL 1382592, at *5 n.6 (S.D.N.Y. Nov.
7, 2001) ("Where applicable, the CISG may render enforceable agreements not evidenced by a
writing and therefore subject to the Statute of Frauds."); Larry DiMatteo et al., The Interpretive Turn
in International Sales Law: An Analysis of 15 Years of CISG Jurisprudence, 24 Nw. J. Int'l L. &
Bus. 299, 437 n.872 (2004) (explaining how CISG Article 11 does away with the writing
requirement). According to CISG Article 11, "[a] contract of sale need not be concluded in or
evidenced by writing and is not subject to any other requirement as to form[, but] may be proved by
any means, including witnesses." CISG art. 11, 19 I.L.M. at 674. In particular, it may be proved
by oral statements between the parties; the CISG, unlike American contract law, includes no parol-
evidence rule, and "allows all relevant information into evidence even if it contradicts the written
documentation." Claudia v. Olivieri Footwear Ltd., No. 96 Civ. 8052 (HB)(THK), 1998 WL
164824, at *4-*5 (S.D.N.Y. Apr. 7, 1998). CISG Article 8 explains how such oral evidence should
be interpreted:

> (1) For the purposes of this Convention statements made by and other conduct of a
> party are to be interpreted according to his intent where the other party knew or
> could not have been unaware what that intent was.
> (2) If the preceding paragraph is not applicable, statements made by and other
> conduct of a party are to be interpreted according to the understanding that a
> reasonable person of the same kind as the other party would have had in the same
> circumstances.
> (3) In determining the intent of a party or the understanding a reasonable person
> would have had, due consideration is to be given to all relevant circumstances of
> the case including the negotiations, any practices which the parties have

established between themselves, usages and any subsequent conduct of the parties.

CISG art. 8, 19 I.L.M. at 673; <u>see also</u> <u>MCC-Marble Ceramic Ctr. v. Ceramica Nuova D'Agostino,</u> <u>S.P.A.</u>, 144 F.3d 1384, 1388-89 (11th Cir. 1998) (noting that Article 8(1) "requires a court to consider . . . evidence of the parties' subjective intent" and that Article 8(3) "is a clear instruction to admit and consider parol evidence regarding the negotiations to the extent they reveal the parties' subjective intent").

Under the CISG, therefore, any statements made between Schubert (or its representatives) and TVT (or its representatives) that contradict the written "Terms and Conditions," or that indicate that the "Terms and Conditions" section as a whole is not part of the final agreement between the parties, must be considered in deciding what is part of the February 1995 Quotation Contract. Some of the relevant statements, for example, tend to indicate that the entire "Terms and Conditions" section does not apply. In particular, TVT contends that a Schubert agent told TVT, in the course of conversations occurring between February 3, 1995 (the date that the February 1995 Quotation Contract was drafted) and February 13, 1995 (the date that TVT sent its acceptance of the February 1995 Quotation Contract), that TVT should "'not worry' about the fine print" and "that the boilerplate fine print [comprising the Terms and Conditions section attached to the February 1995 Quotation Contract] was meaningless on this project." (Gottlieb Decl. Opp'n ¶ 11.) TVT also claims that the Schubert agent "said everything necessary to comfort [TVT] and assure [TVT] that those pages were inapplicable to this deal" and that TVT "could ignore the fine print." (Id. ¶ 12; Pls.' R. 56.1 Resp. ¶ 2 (alleging that Gottlieb was told by Schubert's agent that "he could ignore the fine print").) Because CISG Article 8(3) explicitly permits the Court to consult "subsequent conduct" in determining intent, it is relevant to point to Gottlieb's statement that "[i]f [he] had ever

thought that Schubert could enforce the ["Terms and Conditions"] . . . [he] would never have gone forward with Schubert; and [Schubert's agent] and those he represented in Germany certainly knew that."  (Gottlieb Decl. Opp'n ¶ 13.)  Schubert's agent claims, however, that he said that he merely told TVT "not to worry about or over-emphasize the fine print."  (Neuber Decl. Opp'n ¶ 5.)  In particular, he claims that he did not use the word "ignore."  (Id.)  Although this language, without more, is not strong enough to completely confirm TVT's interpretation that the "Terms and Conditions" section is unenforceable, it is strong enough to raise a genuine factual question regarding whether Schubert's agent "could not have been unaware" that TVT was interpreting his words and conduct as doing away with the boilerplate "Terms and Conditions."

The matter is made more complex because one of the provisions in the "Terms and Conditions" section is a merger clause, which extinguishes all prior oral agreements:

> This quotation comprises our entire quotation.  On any order placed pursuant hereto, the above provisions entirely supersede any prior correspondence, quotation or agreement.  There are no agreements between us in respect of the product quoted herein except as set forth in writing and expressly made a part of this quotation.

(February 1995 Quotation Contract, Terms & Conditions, Merger Clause.)  The question of whether, under the principles of the CISG, a prior oral agreement to disregard boilerplate language itself containing, inter alia, a merger clause, trumps the written merger clause itself appears to be a question of first impression for (at the very least) American courts.  Indeed, "U.S. federal caselaw interpreting and applying the CISG is scant."  Usinor Industeel v. Leeco Steel Prods., 209 F. Supp. 2d 880, 884 (N.D. Ill. 2002).  Although the Eleventh Circuit's decision in MCC-Marble contains nearly identical facts to this case, see generally 144 F.3d 1384, the merger-clause issue was notably absent in that case, see id. at 1391 & n.19 (noting that parties may be able to avoid parol-evidence issues by including a merger clause extinguishing any prior understandings not expressed

15

in the writings, but notably not discussing whether a prior oral agreement to disregard boilerplate language that includes a merger clause trumps the written merger clause itself).

The Court thus turns to the text of the CISG, as interpreted by the CISG Advisory Council. See Delchi Carrier, 71 F.3d at 1027-28 ("Because there is virtually no caselaw under the Convention, we look to its language and to 'the general principles' upon which it is based." (quoting CISG art. 7(2))). The CISG Advisory Council has noted that "extrinsic evidence [such as the oral dealings between Schubert and TVT representatives] should not be excluded, unless the parties actually intend the Merger Clause to have this effect" and that "Article 8 requires an examination of all relevant facts and circumstances when deciding whether the Merger Clause represents the parties' intent." See CISG-AC Opinion no. 3 ¶ 4.5 (Oct. 23, 2004). That is, to be effective, a merger clause must reflect "the parties' intent." Id. (emphasis added). This suggests that if either party had a contrary intent, the merger clause between them would have no effect; only if both Schubert and TVT shared the intent to be bound by the Merger Clause contained in the "Terms and Conditions" is the Merger Clause operative.[2]

There exists a genuine issue of material fact as to whether Schubert and TVT shared the intent to be bound by the "Terms and Conditions" portion of the February 1995 Quotation Contract or the written Merger Clause contained therein. If the final writing evinces the shared intent of TVT

---

[2] Likewise, this is in accord with the Advisory Committee's observation that "Articles 8 and 11 express the general principle that writings are not to be presumed to be 'integrations.'" Id. ¶ 2.1. Though not per se applicable, the following comment to the Principles of European Contract Law—to which the CISG Advisory Council refers in its opinion covering merger clauses—further supports the Court's interpretation: "It often happens that parties use standard form contracts containing a merger clause to which they pay no attention" such that "[a] rule under which such a clause would always prevent a party from invoking prior statements or undertakings would be too rigid and often lead to results which were contrary to good faith." CISG-AC Opinion no. 3 ¶ 4.4 n.53 (Oct. 23, 2004). And the notion of "good faith in international trade" must underlie any CISG interpretation. CISG art. 7(1), 19 I.L.M. at 673.

and Schubert (by their agents) to proceed with a meaningful Merger Clause, then the "Terms and Conditions" section is part of the February 1995 Quotation Contract such that the liability limitations apply,[3] see CISG art. 6, 19 I.L.M. at 673 (allowing contracting parties to "derogate from or vary the effect of any of [the CISG's] provisions"), meaning that the warranty provision in the "Terms and Conditions" section would override the protections of CISG Article 35 and undermine TVT's Article 35 cause of action.[4] If, however, there was no shared intent of TVT and Schubert (by their agents) to be bound by either the "Terms and Conditions" section or Merger Clause, then the "Terms and Conditions" section and Merger Clause would drop out, and TVT would be entitled to the full

---

[3] Schubert argues, for example, that any recovery by TVT of breach-of-contract damages should be limited to the machine price, based on the "Limitation of Liability" clause (paragraph 6) of the "Terms and Conditions" section of the February 1995 Quotation Contract, because CISG Article 6 allows contracting parties to "derogate from or vary the effect of any of [the CISG's] provisions." (See Def.'s Mem. Supp. at 17-19 (arguing that "at most, [TVT's] recovery must be capped at the $862,160 amount quoted for the machinery").

[4] The full text of the warranty provision reads:
    WARRANTY:
    (a)    Any product or part thereof covered by this quotation which, under normal operating conditions in the plant of the original user thereof, proves defective in material or workmanship within 6 mos. from the date of shipment by us, as determined by an inspection by us, will be replaced free of charge, provided that you promptly send to us notice of the defect and establish that the product has been properly installed, maintained and operated within the limits of rated and normal usage.
    (b)    The terms of this warranty do not in any way extend to any product or part thereof covered by this quotation which has a life, under normal usage, inherently shorter than the period indicated above or which was not manufactured by us or an affiliate of ours.
    (c)    Said warranty in respect to replacement of defective parts and any such additional warranty or representation expressly made a part of this quotation are in lieu of all other warranties express or implied in respect of any product or part thereof covered by this quotation. NO WARRANTY OF MERCHANTABILITY OR FITNESS FOR PURPOSE SHALL APPLY.
(February 1995 Quotation Contract, Terms & Conditions ¶ 4.)

panoply of implied warranties offered by the CISG, including the Article 35 provisions forming the basis of this contract claim.

Summary judgment is inappropriate on TVT's Article 35(2)(a)-(b) claim because there is a genuine issue of material fact regarding the parties' intent to incorporate the "Terms and Conditions" section and Merger Clause therein. Under the guidelines set forth herein, the finder of fact in this case will be required to determine the subjective intent of Gottlieb, on behalf of TVT, and Neuber, on behalf of Schubert, at the time Schubert's offer was accepted by TVT. Nevertheless, TVT is barred from recovering certain categories of damages under the Article 35(2)(a)-(b) claim as a matter of law. Thus, on this contract claim, summary judgment for Schubert is **DENIED** except with respect to certain categories of damages, as the Court will now explain.

### 2.     Fitness for Ordinary or Particular Purpose: Damages

Article 45(1)(b) of the CISG permits TVT to seek damages determined by, inter alia, CISG Article 74. TVT exercises this option. (See Compl. ¶ 73 (seeking to "recover damages from Schubert 'equal to the loss, including loss of profit, suffered by [plaintiffs] as a consequence of the breach'" under CISG Article 74) (alteration in original).) According to the CISG, TVT is entitled to "a sum equal to the loss, including loss of profit, suffered by the other party as a consequence of the breach . . . not [to] exceed the loss which the party in breach foresaw or ought to have foreseen at the time of the conclusion of the contract, in the light of the facts and matters of which he then knew or ought to have known, as a possible consequence of the breach of contract." CISG art. 74, 19 I.L.M. at 688. The foreseeability requirement, the Second Circuit has explained, is identical to the well-known rule of <u>Hadley v. Baxendale</u>, 156 Eng. Rep. 145 (Ct. Exch. 1854), such that relevant interpretations of that rule can guide the Court's reasoning regarding proper damages. <u>See</u> <u>Delchi</u>

Carrier, 71 F.3d at 1030. According to CISG Article 74, only "the loss"—and not whether a defendant would be liable for the loss—need be foreseeable. CISG art. 74, 19 I.L.M. at 688. Thus, it is irrelevant whether Schubert could have foreseen being estopped from asserting the Merger Clause. In addition to being foreseeable, damages must be capable of computation with "sufficient certainty." Delchi Carrier, 71 F.3d at 1029. With these twin requirements in mind—foreseeability and calculation with sufficient certainty—the Court will now discuss each category of damages enumerated in Plaintiffs' Complaint.

### i. Funds Paid to Cinram for Use of Its Services and Facility and Funds Needed to Find a Replacement Facility

TVT seeks damages including "the loss of funds that [TVT] spent on the facility for producing Bioboxes at Cinram, Inc." and "money that [TVT] will have to spend to replace the Cinram facility." (Compl. ¶ 74.) For the following reasons, Schubert's request for an order granting summary judgment on TVT's Article 35(2)(a)-(b) claim is **GRANTED** only as to these two measures of damages.

TVT does not attempt to show, nor does it claim, that had it contracted with a company other than Schubert to make a Biobox-production system, it would have been able to proceed without a machine housing facility similar to Cinram. Thus, a large part of this category of damages represents a fixed cost, which is not recoverable because it would have been incurred regardless of whether the breach occurred. It is possible, however, that certain of these expenses were caused by the malfunctioning in particular and would not have been incurred if the Schubert System ran properly. (See Gottlieb Decl. Opp'n Ex. T (list of Biobox "line problems" encountered by Cinram maintenance staff dated Dec. 6, 1997); id. Ex. U (Rodico Dec. 2-12, 1997 Visit Report to TVT.) That such a mishap could result in increased costs relating to the facility in which the machine is

19

housed was clearly foreseeable "at the conclusion of the contract," CISG art. 74, 19 I.L.M. at 688, to any company dealing in implements of manufacture. There is no evidence in the record, however, which permits these expenses—or any expenses associated with Cinram—to be computed with "sufficient certainty." See Delchi Carrier, 71 F.3d at 1029. There is not, for example, any relevant invoice from Cinram to TVT or any reference thereto in the record from which a reasonable inference as to certainty may be drawn. Further, TVT's Expert Report on damages, while including figures for "Equipment" and "Direct Labor," makes no mention of Cinram or of any expense category defined specifically enough to clearly or even probably represent Cinram-related expenses. (See Davis Decl. Opp'n Ex. 3 (Expert Report of Terry H. Korn, CPA, ABV, dated June 2, 2003).) Indeed, it seems likely that "Equipment" represents Biobox production equipment and "Direct Labor" represents work done by Schubert technicians.

With respect to "money that the plaintiffs will have to spend to replace the Cinram facility," at the "conclusion of the contract," CISG art. 74, 19 I.L.M. at 688, Schubert could not have foreseen that, even if TVT had made arrangements with a warehousing facility to house the Schubert System, TVT would have to look for an entirely new facility in the event of a Schubert System malfunction. Indeed, the Court finds no evidence in the record that tends to show why or even that TVT now needs a new packaging-production facility.

Thus, summary judgment with respect to funds paid to Cinram for use of its services and facility and funds needed to find a replacement facility is **GRANTED** to Schubert against TVT because "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that [Schubert] is entitled to a judgment as a matter of law," see Fed. R. Civ. P. 56(c).

ii. **Funds Paid for the Schubert System, for Labor and Service on the Schubert System, for Administration of the Biobox Project, and for Lost Profits From Biobox Sales and Licensing**

TVT also seeks damages including the loss of "[1] funds paid to Schubert and Rodico for the Schubert system . . . [2] funds spent on other equipment, labor and services to support the Schubert system . . . [3] funds devoted to administration of the Biobox project . . . [and 4] the profits from sales and licensing that the plaintiffs lost due to Schubert's failure to deliver a system that properly produced plaintiffs' patented product." (Compl. ¶ 74.) For the following reasons and those stated in Part C.2.a.1, supra, Schubert's request for an order granting Schubert summary judgment on TVT's Article 35(2)(a)-(b) claim is **DENIED** as to these remaining four measures of damages.

### A. Funds Paid for the Schubert System

The price of the actual machine contracted for, that is, "funds paid to Schubert and Rodico for the Schubert system," is the archetypal benefit of the bargain. Schubert does not dispute that such a loss—money directly paid to Schubert—is foreseeable and computable with sufficient certainty. Thus, the Court cannot grant Schubert summary judgment on TVT's Article 35(2)(a)-(b) claim with respect to these funds.

### B. Funds Paid for Labor and Service on the System

Although some portion of the installation and maintenance cost incurred by TVT with respect to the Schubert System would have been required for the setup of even a perfectly functional machine, "[the] proper rule of damages having been applied, the amount of the damages is a question of fact." See Tri-Bullion Smelting & Dev. Co. v. Jacobsen, 233 F. 646, 650 (2d Cir. 1919) (emphasis added). To this end, there exists a genuine issue of material fact as to what portion of the "installation and training" invoices paid by TVT represent service repairs and what portion represent

costs that would have been incurred regardless of whether there were problems with the Schubert System. Summary judgment on TVT's Article 35(2)(a)-(b) claim with respect to this measure of damages must be denied.[5] See Delchi Carrier, 71 F.3d at 1031 (remanding to the district court on the issue of labor expenses to determine factually whether those costs would have been incurred anyway).

### C. Funds Paid for Administration of the Project

With respect to "funds devoted to administration of the Biobox project," TVT alleges that during pre-contractual negotiations, it was made clear to Schubert that TVT would use the resulting machinery to produce Bioboxes. Indeed, this was the explicit purpose of the project. Thus, it was foreseeable "at the conclusion of the contract," CISG art. 74, 19 I.L.M. at 688, that problems with the Schubert System could result in increased administrative costs for TVT with respect to the Biobox venture. Further, although they are estimates, the payroll figures and administrative cost figures included in TVT's Expert Report (Davis Decl. Opp'n Ex. 3 (Expert Report of Terry H. Korn, CPA, ABV, dated June 2, 2003)) provide a trier of fact with the ability to compute the amount of damages with "sufficient certainty," see Delchi Carrier, 71 F.3d at 1029. That the Expert Report provides a range of outcomes rather than one single number does not trouble the Court, as strict "mathematical precision" is not required in damage computation. Schonfeld v. Hilliard, 218 F.3d

---

[5] Further, there is an issue of fact as to whether some of the "installation and training" invoices were paid at all (regardless of what portion of them is attributable to non-fixed costs). For example, a March 1999 letter from Rodico to Schubert indicates that there were open invoices that TVT had not paid. (Gottlieb Decl. Opp'n Ex. M (letter from Rodico to Schubert dated Mar. 8, 1999 indicating that "[t]he reason as to why TVT is not paying the open invoices should not come as a surprise to you nor anybody else at Schubert").) Gottlieb cites an exhibit, however, that contains the same four invoices as an example of when TVT "accede[d] to Schubert's demands [for payment]." (Id. ¶ 22 (citing Gottlieb Decl. Opp'n Ex. R (memorandum from Rodico to TVT dated Nov. 21, 1997 with four invoices "pertaining to the start-up of the Schubert system" for the services of Schubert technicians attached thereto).)

164, 172 (2d Cir. 2000). Thus, to the extent that administrative costs were incurred specifically because of the product malfunctioning (and are not part of fixed administrative costs), summary judgment on this CISG claim with respect to this measure of damages must be denied.

### D.    Lost Profits from Biobox Sales and Licensing

Plaintiffs seek "the profits from sales and licensing that the plaintiffs lost due to Schubert's failure to deliver a system that properly produced plaintiffs' patented product." Viewed in the light most favorable to TVT, the facts demonstrate that lost profits, as a general measure of damages, were foreseeable at the conclusion of the February 1995 Quotation Contract. See Delchi Carrier, 71 F.3d at 1030 (noting that the CISG provides that damages for breach include "lost profits, subject only to the familiar limitation that the breaching party must have foreseen, or should have foreseen, the loss as a probable consequence" (citing CISG art. 74; Hadley, 156 Eng. Rep. 145) and that the standard formula to calculate lost profits is "to deduct only variable costs from sales revenue . . . because the fixed costs would have been encountered whether or not the breach occurred").

With respect to foreseeable lost profits, Gerhard Schubert (Schubert's founder and principal) stated in his deposition that he knew, at least as early as 1994, that the Schubert System was to be used to "raise an interest in the market for [the Biobox]," and, more pointedly, that he "understood that the first machine would also be used to make actual Bioboxes to fill orders from customers." (Davis Decl. Opp'n Ex. 4 (Gerhard Schubert Dep., Nov. 29, 2002 at 121:6-122:8).) Further, a Schubert agent stated in his deposition that he knew, before TVT placed its order, that TVT intended to use the Schubert System to sell Bioboxes to customers. (Id. Ex. 5 (Cornelius Lindner Dep., Nov. 30, 2002 at 82:1-82:8).) Finally, a facsimile from Rodico to Schubert indicates knowledge, before the February 1995 Quotation Contract was entered into, of the plans to sell and advertise Bioboxes

"during the Christmas season." (Gottlieb Decl. Opp'n Ex. P (facsimile from Rodico to Schubert dated Feb. 6, 1995 regarding Gottlieb's displeasure with the delays).)

Although not all of TVT's projected profits can be recovered, at least some portion of TVT's lost profits can be computed with the requisite certainty from actual orders, which do not suffer from the same speculation as other projected profits. Plaintiffs had actual Biobox orders from certain customers, some of whom had been in direct communication with Schubert. (See Gottlieb Decl. Opp'n ¶ 34 ("TVT had actual customers . . . for the Bioboxes to be produced."); id. Ex. H (memorandum from Neuber at Rodico to Schubert dated Dec. 10, 1996 noting that he had "talked to customers of [Gottlieb's]".) The orders themselves are absent from the record before the Court, but the Court must draw the reasonable inference favorable to TVT that they do indeed exist, and permit a trier of fact to determine the precise amount of damages attributable to the orders as representative of foreseeable profits calculable with sufficient certainty. See Delchi Carrier, 71 F.3d at 1029; Tri-Bullion Smelting & Dev. Co., 233 F. at 650. Summary judgment on TVT's Article 35(2)(a)-(b) claim with respect to this measure of damages is therefore also denied.

### b.    Failure to Conform to Sample or Model Under Article 35(2)(c)

The analysis of this contract claim under Article 35(2)(c), which states that goods do not conform with a contract unless they "possess the qualities of goods which the seller has held out to the buyer as a sample or model," is (except for the particular subpart of CISG Article 35 forming its basis) identical to the first CISG claim under Article 35(2)(a)-(b) with respect to both breach and damages. That is, even assessing the record in the light most favorable to TVT, there is no genuine issue of material fact with respect to the Schubert System's failure to produce Bioboxes at the proper rate and of the proper quality, nor is there a genuine issue of material fact regarding whether the

timeliness with which TVT informed Schubert satisfies the Article 39(1) reasonable notification requirement. Article 45—the same CISG provision which authorized TVT to seek damages stemming from the incidents leading to its Article 35(1) claim—allows TVT to seek damages with respect to this Article 35 claim, as well. These damages are again sought under CISG Article 74, 19 I.L.M. at 688. Thus, summary judgment for Defendant on this claim is **GRANTED** to the same extent—that is, with respect to the same two measures of damages—that summary judgment for Schubert on TVT's Article 35(2)(a)-(b) claim was granted and **DENIED** to the same extent—that is, with respect to the same four measures of damages—that summary judgment for Schubert on TVT's Article 35(2)(a)-(b) claim was denied.

### 3. Breach of Guarantee Under the United Nations Convention on Contracts for the International Sale of Goods Under Article 36

Article 36(2) states that "[t]he seller is also liable for any lack of conformity . . . which is due to a breach of any of his obligations, including a breach of any guarantee that for a period of time the goods will remain fit for their ordinary purpose or for some particular purpose or will retain specified qualities or characteristics." CISG art. 36(2), 19 I.L.M. at 679.

The analysis of this contract claim is, except for its basis being contained in CISG Article 36(2) rather than Article 35, identical to the other CISG claims with respect to both breach and damages.[6] That is, the facts concerning sub-par Biobox production, recited <u>supra</u>, prove breach, and

---

[6] It should be noted that, if the "Terms and Conditions" section is determined by the trier of fact to be an enforceable provision of the February 1995 Quotation Contract, CISG Article 36(2) would no longer apply, despite the fact that the "Warranty" provision itself includes a six-month workmanship guarantee. (<u>See</u> February 1995 Quotation, Terms & Conditions ¶ 4(a) ("Any product or part thereof covered by this quotation which, under normal operating conditions in the plant of the original user thereof, proves defective in material or workmanship within 6 mos. from the date of shipment by us, as determined by an inspection by us, will be replaced free of charge, provided that you promptly send to us notice of the defect and establish that the product has been properly installed, maintained and operated within the limits of rated and normal usage.").) Although the two guarantees are

the facts concerning the timeliness with which TVT informed Schubert satisfy the Article 39(1) reasonable notification requirement. Article 45—the same CISG provision which authorized TVT to seek damages stemming from the incidents leading to its Article 35 claims—allows TVT to seek damages with respect to the Article 36 claim as well. These damages are again sought under CISG Article 74. Thus, summary judgment for Defendant on this claim is **GRANTED** and **DENIED** to the same extent—that is, with respect to the same measures of damages—that summary judgment for Schubert on TVT's Article 35 claims was granted and denied.

**D.    TVT's Tort Claims**

TVT asserts common-law fraud and negligence claims. (See Compl. ¶¶ 100-106 (fourth claim for relief for common-law fraud); id. ¶¶ 107-113 (fifth claim for relief for negligence).)

**1.    Choice of Law**

New York State law applies to each of TVT's tort claims. Because TVT's common-law fraud and negligence (i.e., non-CISG) claims are premised on diversity jurisdiction, the Court must apply the choice-of-law principles of New York, the forum state. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). Under New York law, a "court must apply the substantive tort law of the state that has the most significant relationship with the occurrence and with the parties." Machleder v. Diaz, 801 F.2d 46, 51 (2d Cir. 1986) (citing Babcock v. Jackson, 191 N.E.2d 279, 288 (1963)). Because TVT's principal place of business is New York and because the alleged fraud

---

substantively similar, they differ in that one is provided by the CISG and one is not. Because the "Warranty" provision disclaims "all other warranties express or implied" (id. ¶ 4(c), it disclaims the CISG Article 36 warranty and thus eliminates the Article 36 cause of action. That is, although the cause of action provided by the "Warranty" provision itself would be nearly identical to that provided by CISG Article 36, Plaintiffs quite clearly sued under the latter and not the former, and as long as they assert a CISG cause of action, any valid provision disclaiming such a cause of action will defeat their CISG claim, no matter how similar the two causes of action would be in substance.

occurred in New York (where the contract at issue was negotiated and where there was repeated contact between the parties either directly or through agents, including numerous meetings at TVT's New York office), New York has the most significant relationship with the occurrence and the parties and the Court will apply New York law to TVT's negligence and fraud claims.[7]

Further, both parties rely on New York law in the analysis of Plaintiffs' tort claims in their submissions to the Court (see Def.'s Mem. Supp. at 4-7; Pls.' Mem. Opp'n at 4-9; Def.'s Mem. Reply at 4-6) such that the parties have consented by their conduct to have the law of the forum state apply to the tort claims at issue.  See American Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d 130, 134 (2d Cir.1997) ("[W]here the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry.").

### 2.     TVT's Common-Law Fraud Claims

To prove common-law fraud (based on misrepresentation) under New York Law, TVT must show that (1) Schubert made a false representation of a material fact; (2) with knowledge of its falsity; (3) with scienter, namely an intent to defraud TVT; (4) and upon which TVT "justifiably relied"; (5) thereby causing damage to the TVT.  See Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 239 (2d Cir. 1999).

Here, contrary to Schubert's urgings, the fraud claim is not duplicative of the contract claim and thus does not, as a threshold matter, bar the action.  See Bridgestone/Firestone, Inc. v. Recovery

---

[7] To the extent that the choice-of-law analysis for Plaintiffs' negligence claim relies on New York choice-of-law rules for contracts rather than torts (because the negligence claim is "contractual" in nature), New York law still applies.  See Wm. Passalacqua Builders v. Resnick Developers, 933 F.2d 131, 137 (2d Cir. 1991) ("Choice of law issues involving contractual disputes are resolved in New York by an interest analysis, and therefore the law of the jurisdiction having the greatest interest in the litigation controls.").  New York, the situs of TVT's injury and a central location in TVT-Schubert contract negotiations, clearly has the "greatest interest" here.

Credit Sys., Inc., 98 F.3d 13, 21-22 (2d Cir. 1996) (citing Deerfield Communications Corp. v.

Chesebrough-Ponds, Inc., 502 N.E.2d 1003 (1986) (refusing to dismiss a fraud claim alleging "a

misrepresentation of present fact, not of future intent," which was "collateral to, but [also] the

inducement for the contract" and thus not duplicative of the contract claim)).  Rather than basing

its fraud claim on conduct during the course of performance, TVT alleges a misrepresentation of a

fact that induced it to enter into the February 1995 Quotation Contract in the first place.  (See Pls.'

Mem. Opp'n at 5 (noting that the fraud claim "is based on affirmative, pre-contract

misrepresentations by Schubert and its authorized agent, Rodico, about indisputably material facts,

and which induced TVT to give the Biobox contract to Schubert"); Compl. ¶¶ 17-19, 101-104

(alleging that Schubert represented that it had the expertise and experience to design, build, and

service a reliable Biobox system, knowing that such representations were false, to induce TVT to

enter into the February 1995 Quotation Contract).)  Such a "false representation[] of present fact"

is actionable as fraud.  See Stewart v. Jackson & Nash, 976 F.2d 86, 89 (2d Cir. 1992).

Nevertheless, summary judgment for Schubert must be **GRANTED** with respect to TVT's

common-law fraud claim because, as a matter of law, any reliance that TVT may have placed upon

any of Schubert's words or conduct was not "justifiable" under New York law.  See Cofacredit, 187

F.3d at 239.  "Where sophisticated businessmen engaged in major transactions enjoy access to

critical information but fail to take advantage of that access, [courts applying New York law] are

disinclined to entertain claims of justifiable reliance."  Grumman Allied Indus. v. Rohr Indus., Inc.,

748 F.2d 729, 737 (2d Cir. 1984).  This principle—which, in one form or another, has been the law

for over 130 years, see, e.g., Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 101 (2d Cir.

1997) (calling such reliance "unreasonable"); Cudahy Packing Co. v. Narzisenfeld, 3 F.2d 567, 570-

71 (2d Cir. 1925) ("Where the means of information are at hand and equally open to both parties, and no concealment is made or attempted, the language of the cases is, that the misrepresentation furnishes no ground for a court of equity to refuse to enforce the contract of the parties. The neglect of the purchaser to avail himself, in all such cases, of the means of information, whether attributable to his indolence or credulity, takes from him all just claim for relief." (quoting Slaughter's Adm'r v. Gerson, 80 U.S. 379, 385 (1872)))—countenances a determination that TVT, due to its use of a packaging and shipping expert, could not have "justifiably relied" on any of Schubert's pre-contractual representations.

From the very start of negotiations, Robert J. Kelsey ("Kelsey"), the president of Kelsey Corp. and a "certified professional" in "packaging and handling," acted as an advisor to TVT, consulting on the Biobox project and frequently serving as a middleman between TVT and Schubert. (Bennett Decl. Supp. Ex. A (Jan. 7, 1995 Mem. from Kelsey to Gottlieb); id. Ex. F (Gottlieb Dep., Feb. 26, 2003 ("Gottlieb Dep.") at 31:2-31:16, 43:12-43:5); see also Gottlieb Decl. Opp'n Ex. A (facsimile cover sheet from Kelsey to Rodico dated Oct. 27, 1994 on behalf of their "client TVT"); id. ¶ 3 n.1 (noting that Kelsey was "one of [TVT's] representatives").) On TVT's behalf, Kelsey engaged in substantive technical discussions with Rodico about Biobox machine specifications. (See Bennett Decl. Supp. Ex. A (facsimile from Kelsey to Rodico dated July 27 1994); id. Ex. B (facsimile from Rodico to Schubert dated September 7, 1994 referencing "[Rodico's] meeting with Mr. Kelsey this morning").) And when it came time to select a system manufacturer, Kelsey "recommended to . . . TVT Records that we go with Schubert for a machine to handle the new folding carton jacket for audio cassettes." (Gottlieb Decl. Opp'n Ex. A (facsimile cover sheet from Kelsey to Rodico dated Oct. 27, 1994).) Rodico provided Kelsey with preliminary design blueprints

and a price quotation largely similar to the February 1995 Quotation Contract that TVT eventually accepted. (See id. (letter from Rodico to Kelsey dated Oct. 28, 1994).) In fact, just over a month before the final February 1995 Quotation Contract was formed, Kelsey provided TVT with a detailed consultant report, attached to which were "a series of machine specifications, packaging dimensions, machine weights, budget costs and explanations of machine purpose and operation that [TVT and its] vendors will need to specify and construct this line for the cartooning, bundling and case packing of audio, video and mini-cam cassettes." (See Bennett Decl. Supp. Ex. A. (Jan. 7, 1995 Mem. from Kelsey to Gottlieb).) TVT may have also enlisted the help of additional consultants. (See Gottlieb Dep. at 43:23-44:5.)

These dealings make it eminently clear that TVT, via packaging consultant Kelsey and perhaps others, had expert advice at the ready and therefore "enjoy[ed] access to critical information." See Grumman, 748 F.2d at 737. TVT had the luxury of obtaining an expert opinion on any and all matters regarding production of the Biobox-production system and regarding any of Schubert's boastful assertions. TVT alleges that "[a]s a record industry executive lacking experience in the packaging industry, Mr. Gottlieb lacked the expertise to verify Schubert's manufacturing capabilities" (Pls.' R. 56.1 Resp. ¶ 5), but this does not allow TVT to claim "justifiable reliance" while simultaneously engaging Kelsey's expertise on such matters. Therefore, TVT will not now be heard to have justifiably relied on any of Schubert's words or conduct, which were easily verifiable (or at the very least could be investigated) by its consultant Kelsey. In fact, Kelsey might have demonstrated a measure of clairvoyance when he wrote to TVT, that "[i]n the main, you are dependant, really, on the reputation and skill of . . . your own . . . consultants." (See Bennett Decl. Supp. Ex. A (Jan. 7, 1995 Mem. from Kelsey to Gottlieb).)

Discussion of the proper damages under the fraud cause of action is therefore irrelevant. Summary judgment for Schubert is **GRANTED** with respect to TVT's fraud claim. Because, with respect to Plaintiffs' fraud claim against Schubert, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that [Schubert] is entitled to a judgment as a matter of law," see Fed. R. Civ. P. 56(c), and because no reasonable jury could return a verdict for TVT with respect to the fraud claim, as "the evidence to support [TVT's] case is so slight," see Gallo, 22 F.3d at 1223-24, see Chambers, 43 F.3d at 37, despite the Court's assessment of the record in the light most favorable to TVT, see Delaware & Hudson Ry. Co., 902 F.2d at 177; Chambers, 43 F.3d at 37. summary judgment for Schubert against TVT is proper with respect to TVT's fraud claim.

### 3.      TVT's Negligence Claims

To maintain an action against Schubert for negligence under New York law, TVT must show (1) that Schubert had a duty to TVT; (2) that Schubert breached that duty by conduct involving an "unreasonable risk of harm"; (3) that TVT suffered damages; and (4) that the breach was the cause-in-fact and proximate cause of harm to TVT.  See McCarthy v. Olin Corp., 119 F.3d 148, 161 (2d Cir. 1997).  TVT alleges that "Schubert had a duty to exercise the reasonable care and prudence that is customary in the high-speed packaging industry" in "its efforts to design, develop, manufacture, install, service, and repair the Biobox production system," and that Schubert "failed to live up to its duty of reasonable care" such that TVT suffered "monetary damages" (including the "loss of funds" paid for the Schubert System itself and  spent on maintenance to support use of the Schubert System and use of the Cinram facility and lost profits).  (Compl. ¶¶ 107-112.)

New York law disallows tort recovery, however, for purely economic loss caused by

defective goods. Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp., 725 F. Supp. 656, 660 (N.D.N.Y. 1989); see also County of Suffolk v. Long Island Lighting Co., 728 F.2d 52, 62 (2d Cir. 1984) ("New York law holds that a negligence action seeking recovery for economic loss will not lie."). "Economic loss" is defined as damage "that is the result of a non-accidental cause, such as deterioration of breakdown of the product itself," as opposed to injury "to person or property resulting from an accidental cause." Niagara Mohawk, 725 F. Supp. at 665 n.6 (quotation marks and citations omitted).

TVT alleges economic loss caused by defective goods. Although New York law allows limited recovery of economic loss for "negligent performance of contractual services," id. at 660 (citing Consolidated Edison Co. v. Westinghouse Electrical Corp., 567 F. Supp. 358, 364 (S.D.N.Y. 1983))), "a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself" (i.e., a duty "spring[ing] from circumstances extraneous to, and not constituting elements of, the contract") has been violated, id. at 662 (quotation marks and citation omitted). The allegations in the Complaint reveal that the crux of this matter is the defective Schubert System and breach of the February 1995 Quotation Contract for the Schubert System. Although TVT alleges that Schubert "failed to adequately and prudently . . . install the system so that it would perform as it had been intended" (Compl. ¶ 111 (emphasis added)), TVT has neither made out a case for "negligent performance of contractual services" nor made any "special additional allegations of wrongdoing" that amount to a breach of a duty distinct from or in addition to breach of the contract at issue. See Niagara Mohawk, 725 F. Supp. at 662 (noting that contractual breach is generally "not actionable in tort in the absence of special additional allegations of wrongdoing" amounting to a breach of a duty distinct from or in addition to breach of a contract).

The negligence claim reads as an afterthought to a Complaint focused on a contract for goods, contractual performance, and breach of contractual obligations. Because "New York law does not recognize a negligence cause of action when economic loss alone is involved," and transmogrification of a contract action into one sounding in tort is "generally prohibited by the courts of New York," id. at 664-65, TVT's negligence cause of action must fail, and summary judgment for Schubert against TVT with respect to TVT's negligence claim is **GRANTED**.

## III. CONCLUSION

Schubert's motion for summary judgment as against SGI on the ground that SGI lacks standing for all claims asserted in Plaintiffs' Complaint is **GRANTED**. Further, Schubert's motion for summary judgment is **GRANTED** as against TVT with respect to (1) TVT's CISG claims regarding funds paid to Cinram for use of its services and facility and funds needed to find a replacement facility and (2) TVT's tort claims. Schubert's motion for summary judgment is **DENIED**, however, as against TVT with respect to the remainder of TVT's CISG claims regarding other measures of damages (i.e., CISG claims regarding funds paid for the Schubert System, funds paid for labor and service on the Schubert System, funds paid to cover administration costs of the Biobox project, and lost profits from Biobox sales and licensing). A status conference to schedule a trial is hereby scheduled for Friday, September 29, 2006 at 9:30 AM in Courtroom 14C.

**So Ordered:** New York, New York
August 22, 2006

*Richard Conway Casey*

**Richard Conway Casey, U.S.D.J.**

33